IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA RECEIVED
EASTERN DIVISION

|  |  |  |
|---|---|---|
| J. MICHAEL FOLEY, individually and on behalf of all others similarly situated, | ) ) ) | 2014 AUG 15 ℙ 4: 39 |
|  | ) | DEBRA P. HACKETT, CLK |
| Plaintiff, | ) | U.S. DISTRICT COURT |
|  | ) | MIDDLE DISTRICT ALA |
|  | ) | CASE No. 3:14 cv 877 |
| V. | ) |  |
|  | ) | CIVIL ACTION |
| GREENE COMMUNICATIONS, INC. | ) | COMPLAINT |
| d/b/a CABLE TV OF EAST ALABAMA, | ) |  |
| R.M. GREENE & CO., INC., | ) |  |
| And MAGNOLIA GREENE, INC. | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## CLASS ACTION COMPLAINT

Plaintiff and class representative, J. Michael Foley, states the following as his Class Action Complaint against defendants Greene Communications, Inc. d/b/a Cable TV of East Alabama, R.M. Greene & Co., Inc., and Magnolia Greene, Inc. (collectively referred to as "CTVEA"):

### INTRODUCTION

1.      Years ago, telephone companies insisted that it was proper and necessary that their customers' only choice in home telephones were those leased to the customer by the telephone company. Long after that practice was banned as abusive and anticompetitive, CTVEA continues that profitable, but illegal, practice with its cable boxes.

2.      Plaintiff brings this class action on behalf of all persons who have subscribed to Premium Cable Services[1] from CTVEA and have been compelled to pay cable box rental fees to

_____

[1] The term "Premium Cable Services" is defined at paragraph 23 herein, using the terminology employed in CTVEA's explanation of its cable practices.

CTVEA.  CTVEA sells tiers of cable television services.  At the most basic level of service, the cable may be connected directly to modern television sets without the need of additional equipment.  However, for Premium Cable Services, for which CTVEA charges additional fees, additional equipment is required to allow the customer to receive the service.  Although this practice has been determined to be anticompetitive and detrimental to consumers, CTVEA has engaged in various tactics to continue to control the cable box options available to its customers and to continue to enjoy the revenue stream created by its unlawful conduct.

3.  CTVEA does not manufacture cable boxes; it purchases them from principal suppliers.  CTVEA will not permit a customer to acquire ownership of a cable box either from CTVEA or the manufacturer.  As alleged in more detail herein, CTVEA has restrained trade in cable boxes so that CTVEA is the exclusive source of cable boxes for its customers.  CTVEA has used this restraint of trade to extract additional revenues from premium cable customers by charging monthly cable box rental fees in addition to the fees it charges for the Premium Cable Services.

4.  Plaintiff brings this case as representative of a class of CTVEA premium cable customers described more completely below, alleging that CTVEA's past and present actions constitute an impermissible restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Sherman Act").  The activities of CTVEA have and will continue to threaten to have substantial adverse competitive effects upon interstate commerce and inflict direct economic injury upon the Plaintiffs.

## THE PARTIES

5.  Plaintiff J. Michael Foley is a citizen of the State of Alabama, is over the age of nineteen (19) years, and is a resident of Smiths Station, Alabama.  At all relevant times Plaintiff

2

J. Michael Foley has been a subscriber to Premium Cable Services provided by CTVEA.

6.       Defendant Greene Communications, Inc. d/b/a Cable TV of East Alabama, is a company with its principal place of business in Phenix City, Alabama, and registered to do business in Alabama.

7.       Defendant R.M. Greene & Co., Inc., is a company with its principal place of business in Seale, Alabama and registered to do business in Alabama.

8.       Defendant Magnolia Greene, Inc., is a company with its principal place of business in Phenix City, Alabama, and registered to do business in Alabama.

9.       CTVEA currently provides cable video programming services and leases cable boxes in communities in East Alabama.  CTVEA represents that it provides cable services in and around the following communities:   Phenix City, Opelika, Ft. Mitchell, Smiths Station, Hurtsboro, and Hatchechubbee.[2]

10.       CTVEA's unlawful business practices, as detailed herein, are uniform within the markets in which CTVEA sells its services.

## JURISDICTION AND VENUE

11.       This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § § 1331 and 1337, in that Plaintiff, on behalf of himself and the members of the Class, asserts claims under the Sherman Act, 15 U.S.C. § 1.

12.       Venue is proper in this Court under 28 U.S.C. § 1391 and 15 U.S.C. § 22 because a significant portion of the events, acts, and omissions giving rise to this action occurred in the

---

[2] For ease of reference, the geographical locations where CTVEA does business are articulated herein in terms of the community or communities they serve. In reality, the actual geographic boundaries of the markets that CTVEA operates in, and controls are bounded by exclusive local franchises granted by local governing authorities (municipalities, counties, or other local governmental subdivisions) to offer cable television services. CTVEA receives easements in which to operate its infrastructure. In turn, CTVEA pays the franchise granting political subdivision a franchise fee collected from subscribers within the franchise area based upon revenues received from cable subscription fees.

3

District, and CTVEA resides, transacts business, or is found within this District.

## CLASS ACTION ALLEGATIONS

13. Plaintiff brings this class action lawsuit on behalf of himself and the Class pursuant to Federal Rules of Civil Procedure 23(b)(1), (2), and (3).

14. Plaintiff brings this class action on behalf of himself and the following class of persons for claims arising under federal law:

> All persons who subscribed to CTVEA for Premium Cable Services and paid a monthly rental fee for an accompanying cable box.

> Excluded from the Class are those CTVEA customers who receive service at an address at which they may receive cable television service from at least one competing cable or fiber optic video service provider in addition to CTVEA; however, this exclusion shall only apply as of the date such competing service became available and does not defeat such class members' right to a remedy for injuries suffered prior to the existence of such competition.

> Excluded from the Class are CTVEA officers, directors or employees of CTVEA; any entity in which CTVEA has a controlling interest; the affiliates, legal representatives, attorneys, heirs, or assigns of CTVEA; and any federal, state, or local governmental entity, and any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staffs.

15. The requirements of Rule 23, including the numerosity, commonality, predominance, typicality, adequacy, and/or superiority elements are all satisfied.

16. Numerosity: The members of the proposed Class and are so numerous that joinder of all members is impracticable. The proposed Class includes thousands of members. The precise number of members of the Class can be easily ascertained through discovery, which will include CTVEA's sales and other records.

17. Commonality/Predominance: There is a well-defined community of interest and

4

common questions of law and fact which predominate over any questions affecting only individual members of the Class. These common legal and factual questions, which do not vary from one class member to another, are based on CTVEA's uniform treatment of members of the proposed Class and Subclasses, and which may be determined without reference to the individual circumstances of any class member, include, but are not limited to the following:

      (a)    Whether CTVEA is liable to Plaintiff and the Class for violations of federal antitrust laws;

      (b)    Whether CTVEA has established illegal tying arrangements for the rental of cable boxes, in violation of federal law;

      (c)    Whether CTVEA's actions caused injury to Plaintiff and the Class and whether CTVEA should be enjoined from further violations;

      (d)    Whether CTVEA should repay to Plaintiff and the Class the money it wrongfully obtained from Plaintiff and the Class; and

      (e)    Whether CTVEA is liable to Plaintiff and the Class for treble damages for its violation of federal antitrust laws.

18.    Typicality:  Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and all class members have been injured by the same wrongful practices in which CTVEA has engaged. Plaintiff's claims arise from the same practices and course of conduct that give rise to the claims of the class members and are based on the same legal theories.

19.    Adequacy:  Plaintiff will fully and adequately assert and protect the interests of the Class, and has retained class counsel who are experienced and qualified in prosecuting class actions, and, specifically, antitrust class actions. Neither Plaintiff nor his attorneys have any interests which are contrary to or conflicting with the Class.

5

20.     Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all Class and Subclass members is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by the Class are in the millions of dollars, the individual damages incurred by each class member resulting from CTVEA's wrongful conduct are too small to warrant the expense of individual suits. The likelihood of individual class members prosecuting separate claims is remote, and even if every class member could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action. Relief concerning Plaintiff's rights under the laws herein alleged and with respect to the Class would be proper. CTVEA has acted or refused to act on grounds generally applicable to the Class and, as such, final injunctive relief or corresponding declaratory relief with regard to the members of the Class as a whole is appropriate.

### FACTUAL ALLEGATIONS

21.     CTVEA provides cable services to customers in selected communities in Alabama as set forth in paragraph 7 above. Cable service providers are sometimes referred to as cable multichannel video programming distributors ("MVPDs").

22.     CTVEA's past and present conduct, as described herein, allows it to unfairly utilize its market power and/or economic power in the cable television markets controlled by

6

CTVEA to compel the Class to acquire necessary cable boxes solely through rental from CTVEA, thereby harming members of the Class by removing competition for the retail sale of cable boxes.

The Tying and Tied Products.

23.     CTVEA's cable programming is offered to consumers based upon tiers of service. At the least expensive level of service, customers receive a limited number of local and national channels for a monthly fee. This is known as "basic cable." Modern television sets are sold as "cable ready" - *i.e.,* the television can receive basic cable simply by attaching the television to a cable connected to the cable MVPD system. Television sets which are not manufactured as "cable ready" units also require the use of a cable box. Due to the availability of "cable ready" televisions in the market, however, customers who rent a cable box but receive only basic level service are not included in the Class.

24.     Customers desiring more choice in video programming can, for an additional monthly fee, subscribe to CTVEA's Premium Cable Services and pay an increased monthly fee to CTVEA. Members of the Class are CTVEA customers who elect to receive premium channels such as HBO, Showtime, and other specialty channels and video programming services not included in the basic cable programming.

25.     For purposes of this Complaint, "Premium Cable Services" is defined as those cable video services, which are not available to customers by simply plugging a cable into a cable-ready television. This definition includes all scrambled or otherwise secured video channels, as well as "pay per view" or "on demand" cable video programming, for which CTVEA charges fees other than the fee for basic cable, but may only be viewed through the use of a cable box.

7

26. According to the most recent Federal Communications Commission ("FCC") annual report on competition in the industry, as of July 2013, there were approximately 101 million subscriptions for Premium Cable Services sold by cable MVPDs (including, but not limited to, CTVEA) in the United States.

27. The Premium Cable Services offered by CTVEA are the "tying product."

28. In addition to paying a fee for cable television, customers that pay for Premium Cable Services must also pay a rental fee to CTVEA for a cable box, sometimes referred to as a "set-top box." The cable box in its simple form serves two functions. First, the cable box allows the consumer to receive video signals and to navigate among the channels carried on a particular cable system. The second function is a cable descrambler or "conditional access device" which controls the security features for premium channels to ensure that customers do not receive Premium Cable Services for which they have not paid.

29. The "tied product" is the cable box CTVEA rents to consumers, for an additional monthly fee, to enable them to utilize CTVEA's Premium Cable Services. For purposes of this pleading, the term "cable box" also includes the dedicated remote-control for such cable box, whether or not CTVEA also charges a separate fee for the rental of the remote control. For purposes of this pleading, the term "cable box" also includes cable boxes that include features in addition to those required to perform the basic navigation and security functions, including, but not limited to cable boxes that have an additional function as a Direct Video Recorder ("DVR").

30. The tying product and the tied product are separate and distinct products. CTVEA does not design or manufacture the cable boxes. CTVEA merely purchases the mass produced cable boxes from the manufacturer and compels its Premium Cable Services customers to rent the cable boxes from CTVEA.

31.     Although cable boxes are manufactured, or would be capable of manufacture, by numerous entities, upon information and belief, the market has been historically dominated by just two suppliers, Scientific Atlanta (a subsidiary of Cisco Systems, Inc.) and Motorola, Inc.. Upon information and belief, Motorola contracts with CTVEA and supplies cable boxes to CTVEA.

Coercion to Purchase the Tied Product.

32.     CTVEA requires class members to rent a cable box directly from CTVEA and from no other source besides CTVEA. Thus, CTVEA ties its Premium Cable Services to the cable box that it requires class members to rent.

33.     Prior to July 1, 2007, the only cable boxes recognized as permissible by CTVEA were those rented to consumers by CTVEA. CTVEA would not provide the Premium Cable Services unless the customer also rented a cable box from CTVEA. As explained below, however, even after July 1, 2007, CTVEA, as a practical matter, continues to require consumers to acquire cable boxes only through CTVEA and denies consumers the benefits of a competitive market in these devices.

34.     The practice of requiring cable subscribers to rent a cable box from the providing cable MVPD to the exclusion of any other source was recognized as an anticompetitive practice. Congress enacted 47 U.S.C. § 549, Section 629 of the Communications Act of 1954, directing the FCC to adopt regulations:

> to assure the commercial availability, to consumers of multichannel video programming and other services offered over multichannel video programming services [i.e. cable companies] of converter boxes, interactive communications equipment and other equipment used by consumers to access multichannel video programming and other services offered over multichannel video programming systems, from manufacturers, retailed and other vendors not affiliated with any

9

multichannel video programming distributor.

35.     Pursuant to 47 U.S.C. § 549, in 1998 the Consumer Electronics Association ("CEA"), in an effort to stop the anticompetitive practices described herein,  sent a lengthy objection to the FCC concerning the practices of cable MVPDs (including CTVEA), which were thwarting the implementation of CableCARD – a small device provided by the cable service provider that, when installed into a TV or other device, allows for access to digital cable services without the need for a cable box - and preventing consumer electronics manufactures from competing in the cable box market.  The existence of the CableCARD has not produced the intended result of introducing competition into the market for cable boxes.

36.     Even though CableCARDs are manufactured by companies other than CTVEA, CTVEA represents to consumers through its website that they are only available through CTVEA for a monthly rental fee.

37.     The monthly rental fee, and other fees bundled with a CableCARD, are greater than the fees charged for a cable box.

38.     Not only are the fees for a CableCARD higher than those for a cable box, but -- even though the technology exists such that the CableCARD performs the same function as a cable box -- CTVEA has limited the effectiveness of CableCARDs, making it unlikely that even the few consumers owning new televisions with CableCARD capabilities would choose to rent the CableCARDs from CTVEA.

39.     In addition to pricing the CableCARDs higher than cable boxes, CTVEA limits the functionality of CableCARDs in the following ways:

> • CableCARDs do not allow consumers to order advanced services such as pay-per-view events or

10

> premium sports packages;
> - CableCARDs do not provide the channel guide services of cable boxes;
> - CableCARDs are not enabled to provide two-way services such as the interactive program guide, or certain pay-per-view events.

40.    These confinements limit the desirability of CableCARDs, so that consumers will have no real choice but to rent a cable box from CTVEA.

41.    Despite the FCC mandated creation of CableCARD technology, CTVEA continues to limit the employment of that technology and continues to require consumers of its Premium Cable Services to continue to rent their cable boxes from CTVEA as a requirement of receiving the Premium Cable Services for which they pay.  As a result of CTVEA and other MVPD's actions, CableCARD technology has not been widely adopted or marketed by consumer electronics manufacturers.  Why would someone want to pay more for a product that does less?

42.    As further evidence of CTVEA's intent and ability to prevent the CableCARD technology from diminishing its control over the cable box market, CTVEA has preserved its position as the sole supplier of cable boxes to its customers by implementing technology that renders the CableCARD technology useless, or impairs its utility, unless the customer also is renting a cable box from CTVEA.

43.    Despite the requirements of federal law, CTVEA continues to require consumers to acquire their cable box only by renting from CTVEA.

Economic Power in the Tying Product Market.

44.    Cable MVPDs, including CTVEA, do not normally compete against each other, but operate in geographically divided local markets.  Generally, Plaintiff -- and all other current and potential cable television subscribers in a CTVEA market -- has no choice but to contract with CTVEA for cable service.  Accordingly, CTVEA has *de facto* monopoly power in many

areas in which it provides cable television services or otherwise has sufficient market power to appreciably restrain free competition as alleged herein. Indicative of such monopoly power, over the last decade average cable prices paid by consumers have risen by 93%, or three times the inflation rate over the same period.

45.    In those markets controlled by CTVEA, CTVEA's control over all cable television services naturally gives CTVEA control over Premium Cable Services. Although the tiers of service are vertically differentiated, Premium Cable Services rely upon the same basic infrastructure, with the addition of the cable box in the customer's home.

46.    According to the Fifteenth Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, issued by the FCC on July 22, 2013 (the "FCC Assessment"), although video programming is distributed by means other than cable, most notably broadcast and satellite services, cable MVPD is the dominant force in the market, and enjoys a nationwide market share of almost 57.4  Moreover, in any nationwide statistic on cable vs. satellite, MVPD competition under-represents CTVEA 's competitive position in the markets in which it chooses to do business, in that satellite MVPD services are available in areas in which no cable television service is available. Conversely, in urban areas, the physical requirements to receive satellite MVPD services (an external surface with a clear sight line to the sky on which to attach a satellite dish) are harder to find, and often specifically foreclosed to tenants and apartment owners by landlords and/or condominium or cooperative rules. The difficulty in meeting the physical requirements for receiving satellite MVPD services further limits the competitive pressure of satellite services upon cable services. Thus, a 2005 general accounting office ("GAO") study found that satellite MVPD market penetration was only 13% in urban areas, compared to 29% in rural areas.

47.     In addition to CTVEA's claimed superiority in service and reliability over satellite MVPD services, CTVEA enjoys a competitive advantage over such services through its ability to "bundle" its MVPD services with broadband internet access and phone service, provided over the same cable facilities. Because broadband internet access and phone service are not available through satellite MVPD technology, CTVEA enjoys a competitive advantage over satellite MVPDs in those areas in which CTVEA does business.

48.     Moreover, in those markets in which CTVEA does business, it has a further advantage as the incumbent service provider in that switching from CTVEA cable to another MVPD provider, whether an overbuilder, an incumbent phone company, or a satellite MVPD, carries inherent costs to the consumer, including equipment acquisition and time, which must be weighed against whatever benefit the consumer perceives will be attained as a result of the change. Thus, studies have found that even though satellite MVPD customers indicate a high degree of satisfaction with their service, and cable MVPD customers indicate a low degree (less than 50%) of satisfaction with their service, there remains little movement between the two.

49.     As a result, satellite MVPD service is not a suitable direct substitute for cable MVPD services. It has not been demonstrated that customers are willing to transfer service from a cable MVPD to a satellite, despite monopoly pricing for existing customers of the cable MVPD. The FCC Assessment cites evidence that competition from non-cable video programming does not have an effect of restraining prices charged by cable MVPDs. In the few locations where consumers have a choice between two cable services, however, the FCC reports that prices for cable service are 20% lower than in locations with only one cable MVPD.

50.     There are also very high barriers to entry for any potential cable competitor in an established cable MVPD market. The FCC Assessment notes that, along with the high capital

cost of constructing a parallel cable system, there are obstacles to competition created by local franchising authorities, obtaining access to multiple dwelling unit customers (for example - tenants in apartment buildings) and obstacles created by exclusive programming rights to popular channels. As a result of these obstacles, there has been very little effort to construct cable systems to compete with existing cable systems.. If a competing cable system -- referred to in the industry as an overbuild – were to be created, the overbuild systems would not be geographically coextensive with the incumbent cable system. Such overbuilt systems are usually created by relatively small companies. CTVEA can respond to such overbuilt systems by lowering prices, not in the entire market, but only in those areas in which the overbuild system actually competes. More detailed information concerning the geographic scope of such overbuild cable systems, should they exist in relation to CTVEA's coverage area, is in the possession of CTVEA and available in the course of discovery.

51.     The only potentially viable threat to CTVEA's market power has been the very recent arrival of competing MVPD services through fiber optic phone facilities offered chiefly through Verizon and AT&T. These services have not previously been commercially available to consumers on a widespread basis and are viewed as an arising threat, rather than a current competitive influence upon cable MVPDs. Again, as with satellite MVPDs, customers incur substantial switching costs in changing service.

52.     According to the FCC Assessment, the demand for, and price of, Premium Cable Services has consistently risen, resulting in higher revenues for CTVEA and other cable MVPDs offering premium services. In fact, CTVEA has raised its prices the last four years, despite the lean economic times.

Anticompetitive Effects in the Tied Market.

14

53.     As noted above, for most of the relevant time period, the United States market for cable boxes has been dominated by just two companies for years, Scientific Atlanta and Motorola.

54.     CTVEA simply purchases cable boxes at a fixed cost from the manufacturers only to turn around and rent the very same boxes to the Class, with full knowledge that the Class, as a result of CTVEA's improper conduct, has no choice but to pay the rental fees charged.

55.     CTVEA not only refuses to permit customers to use other brands of cable boxes, CTVEA refused to sell its customers the cable boxes it rents to them and does not permit such products to be purchased directly from the manufacturer for use with a CTVEA system.

56.     Upon information and belief, CTVEA's suppliers of cable boxes are able to dominate the market as a result of the anticompetitive conduct of CTVEA and other cable MVPDs. Because CTVEA and other cable MVPDs refuse to permit customers to acquire cable boxes other than by rental through the cable company, consumers suffer, and the suppliers to CTVEA and other cable MVPDs benefit from the removal of competitors and competition in the market for cable boxes. At the same time, CTVEA benefits from the absence of a competitive consumer market for cable boxes because the absence of competition allows CTVEA to compel consumers to rent the cable box from CTVEA, thereby producing a monthly revenue stream from the Class to CTVEA arising directly from its anticompetitive conduct.

57.     Upon information and belief, based upon allegations made in other litigation, Scientific Atlanta and Motorola have previously demonstrated very close relationships with cable MVPDs, including at least one documented case of a willingness to act in collusion with cable MVPDs to manipulate sales data and contracts relating to the sales of cable boxes.

58.     The contracts between CTVEA and the suppliers of cable boxes are not public

15

information but are in the possession of CTVEA and may be obtained in discovery. It is not presently known whether such contracts contain an explicit agreement by the manufacturers to refuse to deal with the general public in selling cable boxes.

59.     If not for the tying of products, Plaintiff and the Class could purchase a cable box from a manufacturer of their choice and use it to access the Premium Cable Services provided (for a cost) by CTVEA. As noted above, the CEA (previously defined) has expressed not only a willingness to enter into the cable box market, but has protested to the FCC that CTVEA and other major cable MVPDs have engaged in a coordinated effort to keep them out of that market.

60.     As pointed out by the CEA's December, 2006 letter to the FCC, although CTVEA and other cable MVPDs reported to the FCC that they were committed to the true2way technology, these same companies had previously represented that they were committed to CableCARD. Quite obviously, consumer electronics manufacturers have not been willing to commit their resources to new product lines when the cable MVPDs have demonstrated a desire to preserve their market positions by changing the technological standard. The choice to use alternative technologies in lieu of a CTVEA cable box has not been available, and is not currently available to the Class.

61.     The choice to use other cable boxes is not available to the Class as a result of CTVEA's practices. By compelling customers to rent cable boxes, and in restraining an open market for cable boxes, CTVEA coerces Plaintiff and the Class to pay a significantly larger sum of money than would be required if the two distinct products (Premium Cable Services and cable box) were not tied by CTVEA.

62.     It is estimated that the useful life of a cable box is between three and five years. In many cases, the rental fees and DVR add-on fees that the Class is forced to pay for the cable

16

boxes and add-on features supplied by CTVEA exceed the true cost of the cable box, even if the cost of the cable box were unadjusted for the effect of the anticompetitive practices on the price of cable boxes.

<u>The Effect on Interstate Commerce is Not Insubstantial.</u>

63.    CTVEA provides cable services to thousands of customers.

64.    A substantial portion of CTVEA's subscribers have upgraded from basic cable to digital video services (referred to herein as the "Premium Cable Services") and, therefore, rent cable boxes from CTVEA.

65.    The exact amount of revenue that CTVEA derives from the lease of cable boxes is not known, but should be readily discernable in discovery.  It is clear, however, that the amount of money at issue is "not insubstantial."

**COUNT I**

**(Violation of the Sherman Anti-Trust Act - Unlawful Tying)**

66.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

67.    Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1, makes it unlawful to enter into a contract in restraint of trade or commerce. Congress has granted a private right of action to those injured in violation of this provision.

68.    Plaintiff, on behalf of himself and the Class, seeks redress for CTVEA's violation of Section 1 of the Sherman Anti-Trust Act.

69.    CTVEA improperly ties its Premium Cable Services with the required rental of a cable box. Specifically and as explained above, CTVEA contracted with the Class to provide Premium Cable Services, but only on the condition that the Class also lease a cable box from

17

CTVEA.

70.     As a result, the Class cannot unbundle the tied products (the Premium Cable Services and the cable box).

71.     There is a market for cable boxes that is separate and apart from the market for CTVEA cable services. The two items (Premium Cable Services and the cable box) are distinct and separate products.

72.     Because of CTVEA's market power in those communities in which it is the sole cable MVPD, the Class is forced to pay rental fees for the cable box in addition to fees for Premium Cable Services and add-on DVR fees, and the Class is deprived of the option of purchasing the cable box in a free and open market, or even directly from CTVEA or its suppliers.

73.     CTVEA has, at all times relevant to this action, maintained sufficient economic power in the Premium Cable Services market to coerce Plaintiffs and the Class to lease and/or otherwise accept the tied product (the cable box) that they would not otherwise lease or accept from CTVEA. This economic power will continue absent the relief sought herein.

74.     CTVEA's improper tying and bundling harms competition. Upon information and belief, just two manufacturers of cable boxes dominate the industry and they provide most of their products to CTVEA and a small group of other major cable MVPDs. Since the Class can only lease cable boxes directly from CTVEA, there is little incentive for other manufacturers to enter the market, and those that do are foreclosed from renting and/or selling cable boxes directly to members of the Class at a lower, market-driven, cost.

75.     CTVEA's conduct at issue involves a substantial amount of interstate commerce in the market for cable boxes.

18

76.     CTVEA 's tying and bundling of its Premium Cable Services and cable boxes constitutes an unreasonable restraint of trade that is unlawful under Section 1 of the Sherman Anti-Trust Act, 15 U.S.C. § 1.

77.     There is no lawful business justification for CTVEA's actions.

## COUNT II

### (Unjust Enrichment)

78.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs.

79.     CTVEA has been unjustly enriched in the amount of the profits it has earned as a result of its conduct as alleged herein.

80.     CTVEA has been unjustly enriched at the expense of and to the detriment of the Plaintiff and each member of the Class.

81.     Under the principles of equity and good conscience, CTVEA holds money which belongs to Plaintiff and the Class, and CTVEA should be ordered to disgorge the profits it has made from its wrongful and illegal conduct alleged herein.

## COUNT III

### (Money Had and Received)

82.     Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs.

83.     Throughout the relevant time period, CTVEA wrongfully received money from Plaintiff and members of the Class as fees for the leasing of cable boxes and for add-on DVR fees.

84.     The money received by CTVEA belonged to Plaintiff and members of the Class,

19

and CTVEA had no right to the funds.

85.    CTVEA has benefited from the receipt of Plaintiff's and Class members' money.

86.    Under the principles of equity and good conscience, CTVEA should not be permitted to retain Plaintiff's and Class members' money, but rather should be ordered to return its profits to Plaintiff and Class members.

## PRAYER FOR RELIEF

Plaintiff, on her own behalf and on behalf of the Class, demands judgment in their favor and against CTVEA as follows:

a.    An Order certifying the Class pursuant to Fed.R.Civ.P. 23 appointing Plaintiff as the representative of the Class, and appointing counsel for Plaintiff counsel for the Class;

b.    An Order that CTVEA violated the Sherman Anti-Trust Act, 15 U.S.C. § 1;

c.    An Order enjoining CTVEA from continuing the practice of tying premium cable services to the rental of a cable box from CTVEA;

d.    An award of all compensatory and other damages suffered by Plaintiff and the Class;

e.    An award of all statutory damages under the Sherman Anti-Trust Act;

f.    An order disgorging CTVEA of the profits wrongfully obtained from Plaintiff and the Class;

g.    An award of all costs incurred by Plaintiff in pursuing this action;

h.    An award of reasonable attorneys' fees; and

i.    Any other relief the Court deems reasonable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues triable.

Respectfully submitted,

W. Daniel "Dee" Miles, III (MIL060)
Archie I. Grubb, II (GRU015)
Andrew E. Brashier (BRA156)
Rebecca D. Gilliland (GIL077)
Attorneys for the plaintiff
BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.
P. O. Box 4160
Montgomery, AL 36103-4160
Tel: (334) 269-2343
Fax: (334) 954-7555
Dee.Miles@BeasleyAllen.com
Archie.Grubb@BeasleyAllen.com
Andrew.Brashier@BeasleyAllen.com
Rebecca.Gililland@BeasleyAllen.com

OF COUNSEL

Joe R. Whatley, Jr.(WHA003)
W. Tucker Brown (BRO228)
Attorneys for the plaintiff
WHATLEY KALLAS, LLP
2001 Park Place North
1000 Park Place Tower
Birmingham, AL 35203
Tel: (205) 488-1200
Fax: (800) 922-4851
jwhatley@whatleykallas.com
tbrown@whatleykallas.com

**PLEASE SERVE THE FOLLOWING:**

**GREENE COMMUNICATIONS, INC. D/B/A CABLE TV OF EAST ALABAMA**
2400 Sportsman Dr.
Phenix City, Alabama 36867

21

**R.M. GREENE & CO., INC.,**
Roy M. Greene
Route 2 Box 580
Seale, Alabama 36875

**MAGNOLIA GREENE, INC.**
Roy M. Greene
2400 Sportsman Dr.
Phenix City, Alabama 36867